PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEFFREY KARL MEYER,
           *Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,
           *Respondent-Appellee.*

No. 06-26

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Louise W. Flanagan, Chief District Judge.
(5:03-hc-00866-FL)

Argued: September 25, 2007

Decided: November 13, 2007

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Shedd joined.

## COUNSEL

**ARGUED:** Paul MacAllister Green, Durham, North Carolina, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** M. Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Caro-

lina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Nearly twenty years ago, Jeffrey Karl Meyer pled guilty to two counts of first degree murder for fatally stabbing an elderly couple during the commission of a robbery. Since then, three separate capital juries have sentenced him to death, and the North Carolina Supreme Court has twice vacated his sentence on direct appeal due to irregularities in the sentencing proceedings. Throughout this time, Meyer's guilt has never been in doubt, and he has never argued that he did not commit the crimes in question.

Meyer now challenges his third capital sentence, raising claims relating to the effectiveness of his counsel, his awareness of the consequences of his plea, and the sentencing court's refusal to admit potentially mitigating evidence. These claims have been heard and rejected by the same state courts that twice vacated Meyer's earlier death sentences. We have reviewed Meyer's claims with care, and we affirm the district court's dismissal of Meyer's federal habeas petition.

I.

A.

The North Carolina Supreme Court has provided a detailed account of the facts of Meyer's case on direct appeal, *see State v. Meyer*, 353 N.C. 92, 540 S.E.2d 1 (2000), so we need only summarize the salient evidence here.

On December 1, 1986, Jeffrey Karl Meyer and Mark Thompson broke into a home owned by Paul and Janie Kutz. At the time, Meyer and Thompson were heavily armed and dressed in the clothing of "ninja" warriors: "oriental assassins from feudal times, highly trained

in martial arts and stealth." *State v. Meyer*, 330 N.C. 738, 741, 412 S.E.2d 339, 341 (1992). Meyer and Thompson, soldiers stationed at Fort Bragg, North Carolina, had been planning to rob the elderly Kutzs for some time.

Upon entering the house, Meyer and Thompson encountered the sixty-eight year-old Mr. Kutz. Meyer initially shot Mr. Kutz with a blow gun, a martial arts weapon that launches sharp darts from a hollow tube. After Mr. Kutz continued to advance, Meyer stabbed him with a butterfly knife. Meyer and Thompson proceeded to stab Mr. Kutz above the left eye, above the right collar bone, across the neck, twice in the upper left chest, in the rib cage, above the left elbow, four times in the back of his chest, and to the left and right of his spine. In addition, defensive wounds were found on Mr. Kutz's left hand, demonstrating an attempt to fend off an attacker. Testimony at trial indicates that Mr. Kutz may have remained alive and conscious for between thirty seconds and five minutes after the stab wounds were inflicted.

Meyer and Thompson then proceeded to stab and kill the sixty-two year-old Mrs. Kutz with butterfly knives. Mrs. Kutz, who was found in a bedroom down the hallway from Mr. Kutz, was stabbed approximately twenty-five times. She also displayed defensive wounds on her hands. Due to the fact the autopsy found Mrs. Kutz's lungs markedly expanded with trapped air and blood, it is likely that Mrs. Kutz remained alive after receiving the stab wounds.

Overwhelming evidence linked Meyer and Thompson to the crimes. First, in the early morning hours after the killing, a military police officer, Robert Provalenko, intercepted Meyer and Thompson, dressed in "ninja" pants and boots, as they drove through a restricted area of Fort Bragg. In their car, Officer Provalenko found jewelry, a TV, and credit cards that were later found to be stolen from the Kutzs' house, as well as a significant arsenal of weaponry, including butterfly knives, nunchucks, and a blowgun.

Second, forensic evidence placed Meyer and Thompson at the scene of the crime. A police investigation found footprints consistent with ninja boots in the dirt around the house, as well as on a dining room chair. Human blood consistent with the type of both victims was

present on the butterfly knives recovered by Provalenko, and fibers found on one or both of the knives were consistent with the upholstery of the chair in which Mr. Kutz's body was found, a blue blanket found with Mrs. Kutz's body, and the pink nightgown worn by Mrs. Kutz at the time of her death. Fibers from the blanket and sheets in the Kutzs' bedroom were also found on the "ninja" clothing worn by both Meyer and Thompson on the night of the murders.

Third, Dale Wayne Wyatt, a soldier stationed at Fort Bragg waiting to appear in court on a worthless-check charge, testified that he met Meyer on December 3, 1986 in a holding facility during his detention. According to Wyatt, Meyer confessed to shooting Mr. Kutz with a blowgun and then stabbing him. Meyer also told Wyatt that he had been dressed as a "ninja" at the time of the crime.

On February 2, 1987, Meyer was indicted on one count of burglary, two counts of armed robbery, and two counts of first degree murder. On May 12, 1988, Meyer pled guilty to the robbery and burglary charges. Four days later, Meyer pled guilty to two counts of first degree murder. The trial judge accepted the murder pleas and, in open court, confirmed that Meyer had discussed the charges with counsel, understood what they meant, and knew he would be sentenced to either life imprisonment or death on each count. The pleas were accepted and recorded the next day after the State's presentation of their factual basis.

### B.

No fewer than four capital juries have been impaneled to sentence Meyer.

Meyer's first capital sentencing proceeding began on June 3, 1988. This sentencing hearing ended in a mistrial, however, after Meyer escaped from the Cumberland County Jail and failed to appear in court during the presentation of his own evidence. Meyer was recaptured a week later.

A second sentencing jury was impaneled on October 24, 1988. At this hearing, the State presented the evidence discussed above demon-

strating how Meyer committed the crimes. In mitigation, Meyer presented expert testimony which indicated that, at the time of the crimes, he suffered from a dissociative personality disorder, a mental illness which causes a person to detach himself from reality. After hearing the evidence, the jury recommended the death sentence for each first degree murder. The North Carolina Supreme Court subsequently vacated Meyer's death sentences on direct appeal because the jury instructions had erroneously required unanimity in the finding of mitigating circumstances. *See Meyer*, 412 S.E.2d at 343-44.

A third sentencing hearing was held in late August 1995. The State and Meyer both presented substantially the same evidence they had presented at the previous proceeding, and the jury again recommended the death sentence for each first degree murder. Meyer directly appealed his sentence to the North Carolina Supreme Court, and the Court again vacated the death sentences and remanded for a new trial. This time, the Court found error when the trial judge conducted an unrecorded in-chambers conference without Meyer's presence. *See State v. Meyer*, 345 N.C. 619, 623, 481 S.E.2d 649, 652 (1997).

The capital sentencing proceeding from which Meyer now seeks habeas relief, his fourth, began on January 28, 1999. The State presented substantially the same evidence it had at the two previous sentencing proceedings. This time, the defense did not present mental health testimony; instead, defense counsel, in his opening statement, argued that the motive for Meyer's crime was theft, not violence: "They did not intend to hurt anyone." The defense counsel's closing argument was that Meyer's intent involved fantasy and theft, that the murders were unplanned and spontaneous, and that Meyer was mentally ill.

After deliberations, the jury found four aggravating factors for each of the two murders: (1) the capital felony was committed while the defendant was engaged in the commission of or an attempt to commit burglary, (2) the capital felony was committed while the defendant was engaged in the commission of or an attempt to commit robbery, (3) the murder for which the defendant stands convicted was part of a course of conduct that included another crime of violence against another person, and (4) the capital felony was especially heinous,

atrocious, or cruel. *See* N.C. Gen. Stat. § 15A-2000(e) (2005). In mitigation, the jury found only one statutory mitigating circumstance submitted — the fact that Meyer had no prior criminal history — and rejected all nine of the proffered non-statutory mitigating factors. *See id.* § 15A-2000(f).

Based on these findings, on February 3, 1999, the jury recommended the death sentence for each of the first degree murders and the court duly imposed these sentences. On December 21, 2000, the North Carolina Supreme Court found no error and affirmed the two death sentences. *See Meyer*, 540 S.E.2d at 18. Meyer subsequently petitioned the United States Supreme Court for a writ of certiorari. The Court denied the writ on October 1, 2001. *See Meyer v. North Carolina*, 534 U.S. 839 (2001).

C.

Meyer next sought post-conviction relief from his capital sentence. In April 2002, Meyer filed a motion for appropriate relief ("MAR") in state court, seeking review of various claims of error that arose out of his state court proceedings. On January 10, 2003, the state MAR court denied all of Meyer's claims on the pleadings. Both the North Carolina and United States Supreme Courts subsequently denied Meyer's petitions for a writ of certiorari.

On November 20, 2003, Meyer filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. In his petition, Meyer raised twenty-five claims of error. On February 20, 2004, the district court dismissed five claims without prejudice on initial review, and, six months later, the district court granted the State's motion for summary judgment on all of the remaining claims. Meyer subsequently filed a timely notice of appeal, and this court granted Meyer a certificate of appealability on the issues discussed below. This court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

II.

We review *de novo* the district court's dismissal of Meyer's habeas petition. *Allen v. Lee*, 366 F.3d 319, 323 (4th Cir. 2004) (en banc); *Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Under 28 U.S.C. § 2254(d), a district court may only grant federal habeas relief for state prisoners when state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2000).

In the present case, we focus on the question of whether the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). The Supreme Court has carefully defined the relevant terms of this provision. A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nonetheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Lenz v. Washington*, 444 F.3d 295, 300 (4th Cir. 2006). "An 'unreasonable application' occurs when a state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations omitted).

As is apparent from the Supreme Court's explication of 28 U.S.C. § 2254(d)(1), federal courts are to accord considerable deference to state courts in their review of state habeas proceedings. *Williams*, 529 U.S. at 412-13. We keep this deference in mind as we take up Meyer's claims in the order he presents them.

### III.

Meyer first claims that his guilty pleas were not voluntary and intelligent, in violation of his Sixth and Fourteenth Amendment

rights, since he did not know he was admitting guilt of premeditated and deliberate murder.

A.

Meyer's short-form indictment for murder charged that he "unlawfully, willfully, and feloniously did of malice aforethought kill and murder, with force and arms," the Kutzs, "in violation of North Carolina General Statutes Section 14-17." This statute provides, in relevant part:

> A murder which shall be perpetrated by means of a nuclear, biological, or chemical weapon of mass destruction as defined in G.S. 14-288.21, poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree.

N.C. Gen. Stat. § 14-17 (2005).

Meyer pled guilty to two counts of "first degree murder," as defined by N.C. Gen. Stat. § 14-17. In open court during his plea proceeding, Meyer stated that he discussed his pleas with counsel and that he understood the nature of the charges against him, and every element of those charges. In addition, Meyer confirmed understanding of the fact that he would be subject to either life imprisonment or the death sentence for each of the two murders.

The State subsequently presented the factual basis for Meyer's pleas. The trial court held that the factual basis was sufficient to support the pleas, and, in doing so, made a finding of fact that, in addition to felony murder, the State had proved beyond a reasonable doubt that there was substantial evidence regarding the elements of premeditation and deliberation.

The trial court's finding was crucial because of North Carolina's "merger" rule. The "merger" rule states that, in cases of felony murder, the underlying felony is unavailable as an aggravating factor for capital sentencing because it is essential to (and therefore "merges" with) the conviction itself. However, if both the underlying felony and premeditation and deliberation are proven beyond a reasonable doubt, the underlying felony becomes available as an aggravating factor. *See State v. Goodman*, 298 N.C. 1, 14-15, 257 S.E.2d 569, 579-80 (1979). This is because premeditation and deliberation provide the necessary elemental support for the first degree murder conviction. *Id.*

Now, on habeas after his fourth sentencing proceeding, Meyer argues that his plea was not a voluntary and intelligent waiver of his constitutional rights. *See Boykin v. Alabama*, 395 U.S. 238 (1969). Meyer contends, supported by affidavits, that he did not know he was pleading guilty to premeditated and deliberate murder or that his plea would allow the State to submit to the jury his underlying felonies as aggravating factors at his sentencing proceeding. He thus argues that he should be permitted to rescind his pleas.

B.

The state MAR court rejected Meyer's argument, and reasonably so. A valid guilty plea requires the defendant to have "a full understanding of the charges against him and the possible consequences of his plea." *See Brady v. United States*, 397 U.S. 742, 749 n.6 (1970). We have no reason under § 2254(d) to doubt the conclusion of the MAR court that Meyer voluntarily pled with full knowledge of both the charges against him and the consequences of his pleas.

First, Meyer contends he was unaware that his pleas constituted an admission of premeditated and deliberate murder. Since there is only one common law crime of murder in North Carolina, and it is clear that Meyer understood he was pleading guilty to that crime, we reject this contention.

North Carolina General Statute § 14-17, the statute to which Meyer pled guilty, incorporates, unchanged, the definition of murder that existed at common law. *State v. Davis*, 305 N.C. 400, 422, 290 S.E.2d 574, 588 (1982). This court has stated that "it is abundantly clear that

under North Carolina law, there is only one common law crime of murder." *Hartman v. Lee*, 283 F.3d 190, 198-99 (4th Cir. 2002).

Common law murder is "the unlawful killing of a human being by a person with 'malice aforethought.'" *Schad v. Arizona*, 501 U.S. 624, 648 (1991) (Scalia, J., concurring in part and concurring in the judgment). Several different theories of the case can supply the *mens rea* of "malice aforethought" necessary for a common law murder conviction: "an intention to kill or grievously injure, knowledge that an act or omission would probably cause death or grievous injury, an intention to commit a felony, or an intention to resist lawful arrest." *Id.* It has never been constitutionally necessary, however, to allege a specific theory in a murder indictment. *See, e.g.*, *Schad v. Arizona*, 501 U.S. 624, 632 (1991) (plurality opinion); *State v. Braxton*, 352 N.C. 158, 173-75, 531 S.E.2d 428, 436-38 (2000) (holding the North Carolina short-form murder indictment constitutional). This is because the "intent to commit a felony" and "premeditation and deliberation," to use two examples, are not necessary elements of common law murder, but rather two theories that can supply the required *mens rea* of "malice aforethought." It is thus consistent with our Constitution for a defendant to be charged solely with "first degree murder," rather than felony or premeditated and deliberate murder.

Furthermore, it is well known that a defendant's guilty plea itself serves as a "conviction," supplying "both evidence and verdict." *Boykin*, 395 U.S. at 242, 243 n.4 (internal quotations omitted). A defendant who pleads guilty admits that he has committed the crimes with which he is charged and waives "his right to [a] trial before a jury." *Brady*, 397 U.S. at 748. In the case of "first degree murder," this means the defendant admits to unlawfully killing another human being with "malice aforethought." If evidence exists to support a finding of multiple theories that can supply the required *mens rea*, the defendant's plea serves as an admission to *all* of those theories. *See State v. Silhan*, 302 N.C. 223, 263, 275 S.E.2d 450, 478 (1981) (holding that a guilty plea means, "nothing else appearing, that [the defendant] is guilty upon any and all theories available to the state").

Given the above, it is clear that Meyer voluntarily pled guilty with full knowledge of the charges he was facing. Meyer was charged with first degree murder, and the Constitution requires no more. A murder

indictment does not have to allege premeditation and deliberation with specificity.

At Meyer's plea colloquy, the court carefully explained to Meyer that he was facing two counts of first degree murder. Meyer confirmed that he understood the nature of the charges, having discussed them with counsel. Meyer thus pled with full knowledge that his guilty plea was an admission to killing the Kutzs with "malice aforethought," under any theory available to the State. Since the State possessed overwhelming evidence that Meyer acted with premeditation and deliberation, his pleas made premeditation and deliberation an admitted fact.[1]

Second, Meyer contends he was unaware of the consequences of

---

[1]Meyer separately claims that the state court's finding that he acted with premeditation and deliberation violated his Sixth Amendment right to trial by jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi* requires a jury to find, beyond a reasonable doubt, any facts that increase the authorized maximum sentence for a criminal conviction. *Id.* at 482-84. Meyer argues that the maximum punishment for felony murder, with no additional findings of fact, is life imprisonment. The trial judge's finding of premeditation and deliberation thus potentially increased Meyer's maximum sentence by enabling submission of his underlying felonies as aggravating factors, since the presence of aggravating factors is necessary for a death sentence.

We reject this claim. As discussed above, Meyer's pleas made premeditation and deliberation an admitted fact. He thus waived his right to a jury determination on the issue. Furthermore, even if we assume *arguendo* that Meyer only pled guilty to felony murder, he still would have been exposed to the death sentence. Meyer's sentencing jury found two aggravating factors — that Meyer's murders were part of a "course of conduct" that included another crime of violence against another person and "especially heinous, atrocious, or cruel," *see* N.C. Gen. Stat. § 15A-2000(e) (2005) — independent of the trial judge's finding. The presence of these factors means that Meyer would have always been exposed to a death sentence; therefore, *Apprendi* is not implicated. Finally, the trial judge's finding in no way displaced the jury's ability to consider the aggravating factors necessary to support imposition of the death penalty. Meyer's death sentence rested on four aggravating factors, and all four were found by a sentencing jury beyond a reasonable doubt.

his plea, since he did not know his admission of guilt would permit the State to submit his underlying felonies as aggravating factors during his sentencing. We reject this argument because, even if true, it does not entitle Meyer to relief.

For a guilty plea to be constitutionally valid, a defendant must be made aware of all the "direct," but not the "collateral," consequences of his plea. *Cuthrell v. Director, Patuxent Institution*, 475 F.2d 1364, 1365 (4th Cir. 1973); *see also Brady*, 397 U.S. at 755. "Direct" consequences have "a definite, immediate, and largely automatic effect on the range of the defendant's punishment." *Cuthrell*, 475 F.2d at 1366. A consequence is "collateral" when it is uncertain or beyond the direct control of the court.

Given this, the "direct" consequence of a guilty plea to first degree murder is straightforward: the defendant is eligible to be sentenced to death, depending on the recommendation of a sentencing jury. Conversely, the fact that a particular aggravating factor will be submitted to a jury is merely a "collateral" consequence. This is because, at the moment a plea is accepted, there is nothing "definite," "immediate," or "automatic" about the impact of any particular aggravating factor. The aggravating factor's impact will be determined by a sentencing jury, and "nothing is . . . predictable" as to how the sentencing jury may weigh the aggravating circumstance. *State v. Smith*, 352 N.C. 531, 551, 532 S.E.2d 773, 786 (2000).

Applying these principles to Meyer's claim, it is clear that Meyer was adequately informed of the direct consequences of his plea. The court specifically told Meyer at his plea colloquy that he would be sentenced to life in prison or death on each separate count, "depending upon the recommendation of a sentencing jury." Meyer confirmed that he understood his potential punishment: this knowledge of the "direct" consequences of his plea is all that is constitutionally required. The fact that Meyer's plea enabled his underlying felonies to be submitted as aggravating factors was merely a "collateral" consequence of his plea. Whether or not he had knowledge of this fact is therefore irrelevant to the constitutional validity of his plea.

IV.

Meyer next claims that his trial lawyer's failure to inform him of the consequences of his plea constituted ineffective assistance of counsel.

A.

As evidentiary support for his state motion for appropriate relief, Meyer submitted an affidavit from the public defender who advised his guilty plea. In this affidavit, Meyer's trial counsel attested to the fact that she had never informed Meyer of two implications of his guilty plea: (1) that it would serve as an admission of the fact that he acted with premeditation and deliberation and (2) that it would therefore automatically make Meyer's underlying felonies available as capital aggravating factors.

Now, Meyer contends on habeas that his attorney's failure to advise him of these implications violated his constitutional right to effective assistance of counsel. According to Meyer, he pled guilty solely to escape the death penalty. With allegedly no knowledge he was admitting guilt of premeditated and deliberate murder, and given the State's overwhelming evidence against him, Meyer claims he pled guilty because it could potentially produce a sentencing advantage. Meyer further contends, however, that had he known the "prohibitively high cost" of his plea — that his underlying felonies would automatically become aggravating factors at sentencing — he would have insisted on going to trial to contest premeditation and deliberation. This failure to inform him of consequences that would have changed his plea decision, Meyer says, violated his Sixth and Fourteenth Amendment right to effective assistance of counsel.

B.

The state MAR court denied Meyer's argument on the pleadings. The MAR court found that Meyer was unable to satisfy the well-known test for ineffective assistance of counsel enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). Since the state court's decision was certainly not an "unreasonable application of clearly

established" Supreme Court precedent, *see* 28 U.S.C. § 2254(d), we affirm the district court's dismissal of Meyer's claim.

In *Strickland*, the Supreme Court developed a two-prong test for evaluating ineffective assistance of counsel claims. In order to succeed on such a claim, a defendant must show: (1) that his counsel's performance did not reach "an objective standard of reasonableness," and (2) that his counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

The *Strickland* approach applies in the context of a guilty plea, and the Supreme Court has clarified the contours of the "prejudice" standard for situations when there is no trial. In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Court held that, in the plea context, counsel's deficient performance is prejudicial only if "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. This is an objective inquiry, *see Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988), and dependent on the likely outcome of a trial had the defendant not pleaded guilty. *Hill*, 474 U.S. at 59-60.

We need not address the performance of Meyer's counsel because, as the state MAR court notes, Meyer is unable to show that he suffered "prejudice" under *Strickland* and *Hill*. In particular, Meyer cannot demonstrate that he would have insisted on going to trial if he knew his underlying felonies would become aggravating factors at sentencing.

The State had overwhelming evidence of Meyer's guilt and that he acted with premeditation and deliberation. Under North Carolina law, a defendant acts with premeditation if he forms an intent to kill for a period of time, however short, before the act. *State v. Holt*, 342 N.C. 395, 397-98, 464 S.E.2d 672, 673 (1995). He acts with deliberation if the homicide is in "furtherance of a fixed design," rather than a reaction to some lawful cause or legal provocation. *Id.* Meyer's actions easily satisfy this standard: he entered the Kutzs' house armed with a small arsenal of weaponry, brutally stabbed Mr. Kutz many times long after he was incapacitated, and subsequently stabbed Mrs. Kutz multiple times. The wanton manner in which the Kutzs were repeatedly attacked indicates that Meyer intended to kill the Kutzs,

and that he did so deliberately. Thus, it is beyond peradventure that, if he had proceeded to trial, Meyer would have been found guilty of first degree murder, and premeditated and deliberate action.

Thus, it is unlikely that Meyer would have gone to trial, even if he was aware that his plea conceded premeditation and deliberation. Meyer's sole goal was to avoid the death penalty. With virtually no chance of establishing actual innocence or successfully contesting premeditation and deliberation, a guilty plea may have offered his best chance of not being sentenced to death. A guilty plea demonstrates remorse, and, since the same jury sits during the guilt and penalty phases of a capital trial, *see* N.C. Gen. Stat. § 15A-2000(a)(2) (2005), it also lessens the exposure of jurors to the often dramatic evidence of the crime. Faced with virtually no chance to succeed on the merits at trial, Meyer has not convinced us that an objective defendant would have insisted on going to trial, even if only to contest premeditation and deliberation.

In so deciding, we note that this case demonstrates an important point: sometimes it is the nature of the evidence, rather than the acts of the lawyer, that "prejudice" the defendant. Meyer committed horrible crimes, and three separate juries sentenced him to death for his actions. At some point, even the most brilliant attorney will be unable to prevent such an outcome.

V.

With his third claim, Meyer argues that the failure of his sentencing attorneys to present mental health mitigation testimony constituted ineffective assistance of counsel.

A.

At his 1988 sentencing hearing, Meyer introduced testimonial evidence from two psychiatrists. First, Dr. Selwyn Rose testified that Meyer was obsessed with Dungeons and Dragons, a role-playing game set in medieval times, and that this obsession caused "defendant to retreat into a fantasy world of Ninja warriors." *Meyer*, 412 S.E.2d at 342. Second, Dr. Thomas E. Radecki testified that Meyer "was so

out of touch with reality . . . I don't think that he really appreciated that he was really killing people. I think that he was living out a game, living out a fantasy . . . . I really don't think he appreciated really seriously what he was doing. He's a very sick man . . . ." *Id.*

After hearing this testimony, the jury unanimously found that Meyer had committed his crime "while . . . under the influence of mental or emotional disturbance," a statutory mitigating factor in North Carolina. N.C. Gen. Stat. § 15A-2000(f)(2) (2005). Despite the presence of this mitigating factor, however, the jury sentenced Meyer to death.

At Meyer's 1995 sentencing hearing, the defense introduced the prior testimony of Dr. Rose, who had passed away in the interim between the two hearings. At least one juror subsequently found each of two statutory mitigating factors: that Meyer acted "under the influence of mental or emotional disturbance," N.C. Gen. Stat. § 15A-2000(f)(2) (2005), and that Meyer's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." *Id.* § 15A-2000(f)(6). Moreover, at least one juror found the non-statutory mitigating factor that Meyer's "contact with reality was impaired." Despite the presence of these statutory and non-statutory mitigating factors, however, the jury again sentenced Meyer to death.

As Meyer's 1999 sentencing hearing approached, Meyer's defense counsel reevaluated his sentencing strategy. Writing a memo to his case file, Meyer's counsel noted that none of the seven experts who had evaluated Meyer had been able to produce compelling evidence that Meyer suffered from mental health problems. Meyer's counsel concluded in a separate memo that "[t]he psychological stuff that has been discovered has not been very compelling and really does not begin to explain his bizarre and horrendous actions. . . . We have gotten zilch credit for his mental health background in the past and it has come off as less than compelling."

Meyer did not offer expert mental health mitigation testimony at his 1999 sentencing hearing, the one from which he now appeals. No statutory mitigating factors pertaining to mental illness were proffered to the jury at this proceeding, and the jury rejected all nine of the

proffered non-statutory mitigating factors, including that Meyer had "emotional problems," "low self-esteem," and "was immature."

Meyer now contends that his attorney's failure to present the available mental health mitigation testimony at his 1999 sentencing hearing violated his right to effective assistance of counsel. As the ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases note, mental health mitigation evidence is extremely important to capital sentencing juries, *see* Commentary to ABA Guideline 4.1 (noting that "mental health experts are essential to defending capital cases"), and defense counsel therefore "should consider" including it at trial. ABA Guideline 10.11.F.2. Thus, Meyer argues that reasonably competent attorney performance demands the presentment of available mental health mitigation evidence at trial, absent some "weighty tactical advantage" to be gained by its withholding. With no such "weighty advantage" present in this case, Meyer contends that his counsel's failure to present mental health mitigation testimony constituted ineffective assistance.

## B.

The state MAR court rejected this argument, finding that the presentation of mental health mitigation testimony would not have changed the outcome of the 1999 sentencing proceeding. We find the MAR court's judgment to be a reasonable application of existing precedent under § 2254(d), as Meyer is unable to satisfy either the "performance" or the "prejudice" prong of the Supreme Court's *Strickland* test.

First, the considered decision of Meyer's counsel not to offer mental health mitigation testimony does not constitute objectively unreasonable performance under *Strickland*. It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. This "highly deferential" standard is necessary because it is "all too easy" to second guess counsel's efforts after they have proven unsuccessful. *Id.* at 689. Since adverse outcomes can make perfectly reasonable judgments look questionable in retrospect, "every effort

[must] be made to eliminate the distorting effects of hindsight." *Id.* at 689.

In the sentencing context, this "highly deferential" standard means that defense counsel have the flexibility to vary their approach given their client's unique circumstances. *See Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice."). This is exactly as it should be: the touchstone of effective representation must be sound, evidence-based judgment, rather than a set of mandates counsel must programmatically follow without deviation. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89.

Given the above, it is clear that the decision of Meyer's counsel not to present mental health mitigation evidence does not constitute deficient performance under *Strickland*. After carefully evaluating the outcome of Meyer's two previous sentencing trials, and the impact psychiatric testimony had on jurors in those cases, Meyer's counsel made a valid strategic choice to try something different.[2]

---

[2]Meyer relies on the Supreme Court's recent decisions in *Rompilla v. Beard*, *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor* to argue that strategies devised after investigation of the law and facts are not unassailable on collateral review. However, Meyer's argument ignores a crucial fact about these three cases: in each of the cases, the Supreme Court's decision was largely based on the fact that defense counsel did not even look at a potentially important source of mitigating evidence. *See Rompilla*, 545 U.S. at 383 (failing to examine the defendant's court file from his previous conviction); *Wiggins*, 539 U.S. at 534 (failing to conduct a thorough investigation into the defendant's background); *Williams*, 529 U.S. at 395-96 (failing to "conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood," seek prison records, and return a phone call from a potential witness on the defendant's behalf).

Meyer's counsel carefully investigated the possibility of presenting mental health testimony and made a reasoned judgment not to, largely based on its previous lack of success. This type of competent performance is different in kind from the actions of counsel in *Rompilla*, *Wiggins*, and *Williams*.

Thus, although the ABA Guidelines, which emphasize the importance of mental health mitigation evidence, may be of some relevance in determining what constitutes reasonable performance in a capital trial, *see Rompilla*, 545 U.S. at 387, *Wiggins*, 539 U.S. at 524, they certainly cannot be dispositive in and of themselves. No *per se* rule requires the presentment of such evidence at trial. In fact, there are many strategically valid reasons why defense counsel, given the circumstances of an individual case, may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a "flight into theory" without proper grounding in the facts of the case; or, as is the case here, the testimony may have been used unsuccessfully in a previous sentencing hearing. A programmatic rule requiring the presentation of mental health mitigation testimony — which Meyer essentially asks us to create in this case — would ignore the very basic fact that different circumstances often require different strategies. Such a *per se* rule would also potentially place lawyers in a very difficult position: forced to present mental health evidence, defense counsel could be challenged for ineffective assistance in the event the evidence is impeached.

The bottom line is thus very simple: after twice presenting mental health mitigation testimony unsuccessfully, Meyer's counsel, after carefully considering and memorializing the testimony of seven experts, decided to adopt a new approach. This decision could hardly be termed unreasonable.

Second, even if we assume *arguendo* that Meyer's counsel did perform deficiently in not presenting mental health mitigation testimony, Meyer would still be unable to satisfy the "prejudice" prong of the *Strickland* standard. To establish prejudice, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Meyer can make no such showing in this case. As discussed in the previous section, the State possessed overwhelming evidence of Meyer's crimes. As the state MAR court noted, two previous sentencing juries heard mental health mitigation testimony and both sentenced Meyer to death.[3] Meyer offers no argument

---

[3]Even though Meyer's prior capital sentences were reversed on appeal, Meyer offers nothing to suggest any "reasonable probability" that a sub-

as to why the presentation of such testimony would have produced a different outcome in this case. As we have mentioned previously, sometimes the nature of the evidence, rather than counsel's judgment calls, "prejudice" the defendant. This is such a case.

## VI.

With his fourth claim, Meyer again alleges that he received ineffective assistance of counsel, this time because of his sentencing counsel's failure to present available testimony of remorse.

## A.

At his 1995 sentencing proceeding, Meyer presented testimony from his mother and a Catholic priest with whom he regularly visited in an attempt to demonstrate he was remorseful for his actions. After deliberating, the jury unanimously rejected the non-statutory mitigating circumstance that Meyer "expressed remorse" for his crime.

In August 1998, Meyer's sentencing counsel wrote a memo to his trial file concerning whether remorse should be a central focus of Meyer's strategy at his re-sentencing. Reflecting on the 1995 sentencing hearing, he noted that the presentation of remorse testimony "hurt us last time," since "the jury unanimously rejected it as a mitigating circumstance, and [the prosecutor] argued somewhat effectively" that Meyer lacked remorse. To Meyer's sentencing counsel, the question of presenting remorse evidence was straightforward: the only way he would feel comfortable putting forward remorse evidence would be if Meyer himself testified. He did not think this was a viable option, however, because Meyer did not "show any remorse or empathy to the victims, at least when I talk with him," a fact reflected in "his courtroom demeanor."

Later in 1998, a social worker met with Meyer to do a mitigation investigation in preparation for his 1999 sentencing hearing. Accord-

sequent jury would have reached a different conclusion. *See Strickland*, 466 U.S. at 694. In all events, the overwhelming evidence against Petitioner affords an ample basis to uphold the state post-conviction court's finding of no prejudice, quite independently of the results of any prior proceeding.

ing to the social worker, during one of her "lengthy interviews" with Meyer, he "became overcome by his emotions and cried." The social worker also noted that Meyer was "very sorry for his part in the Kutzs' tragic deaths" and that she found Meyer's expressions of remorse "completely genuine." The social worker informed Meyer's sentencing counsel of Meyer's displays of remorse, but she was not called to testify at his 1999 sentencing hearing, despite being willing to do so.

Meyer now argues that his counsel was constitutionally ineffective for failing to present the available evidence regarding his remorse. Meyer's argument on this claim proceeds similarly to his argument discussed earlier concerning his counsel's failure to present mental health mitigation evidence. Meyer first notes that there is broad consensus on the fact that evidence of remorse is extremely important to capital sentencing juries. *See, e.g.*, Scott E. Sundby, *The Captial Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell L. Rev. 1557, 1560 (1998). Given this, Meyer argues that it constitutes ineffective assistance to fail to present such potentially effective mitigating evidence. *See* ABA Guidelines 10.11.L ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.").

## B.

The state MAR court rejected this claim, refusing to second-guess defense counsel's trial strategy. For reasons similar to those articulated above in our discussion of Meyer's mental health mitigation claim, we do not think the MAR court's judgment is a "unreasonable application of clearly established federal law." *See* 28 U.S.C. § 2254(d). Meyer is again unable to satisfy either prong of the *Strickland* standard.

First, the considered and memorialized decision of Meyer's sentencing counsel not to present evidence of remorse does not come close to constituting objectively unreasonable performance under *Strickland*. As discussed previously, no "hard-edged rules" define the contours of reasonable attorney performance. *Rompilla*, 545 U.S. at 381. Instead, the unique circumstances of a defendant's case must

determine what constitutes reasonable performance. And within this broad spectrum of viable strategic options, legal judgments based on thorough investigation are virtually unassailable on collateral review. *See, e.g.*, *Strickland*, 466 U.S. at 688-90.

In this case, as with the previous claim, Meyer's counsel had the benefit of a trial run. Meyer's counsel memorialized his belief that Meyer was not remorseful, and that Meyer's courtroom demeanor had not conveyed remorse to the jury. These determinations were based not only on the counsel's own personal interactions with Meyer, but also, and more importantly, on his perception of the effect remorse evidence had at Meyer's earlier sentencing proceeding. Holding that such a reasoned determination constituted objectively unreasonable performance would be worse than folly: it would essentially require capital defense counsel to present evidence of remorse, even if, in their considered judgment, the evidence would affirmatively hurt their defendant's case. *Strickland* does not require any such outcome.

Second, even if we assume *arguendo* that Meyer's counsel did perform deficiently in not presenting remorse evidence, our discussion of "prejudice" in the immediately preceding section on mental health mitigation evidence would be equally applicable here. Given the over-whelming evidence against Meyer and the fact that two previous sentencing juries, one having heard testimony on remorse, sentenced Meyer to death, Meyer is simply unable to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## VII.

Finally, Meyer claims that the state court's exclusion of his co-perpetrator's life sentence from evidence at his sentencing proceeding was constitutional error under *Lockett v. Ohio*, 438 U.S. 586 (1978).

## A.

In 1989, Meyer's co-perpetrator Mark Thompson was tried and convicted by a jury on precisely the same charges faced by Meyer.

*See State v. Thompson*, 328 N.C. 477, 483, 402 S.E.2d 386, 389 (1991). After a sentencing hearing, Thompson was sentenced to two consecutive terms of life imprisonment for murder, an additional consecutive life term for first degree burglary, and forty years imprisonment for the combined counts of robbery with a dangerous weapon. *Id.*

At Meyer's 1999 sentencing hearing, the one from which he now appeals, Meyer asked the court to submit Thompson's life sentences as a non-statutory mitigating circumstance. The trial court declined to submit this mitigating circumstance, and Meyer subsequently appealed the trial court's decision.

On direct appeal, the North Carolina Supreme Court rejected Meyer's claim, noting that, under North Carolina law, "a codefendant's sentence for the same murder is irrelevant" at a sentencing hearing. *State v. Meyer*, 540 S.E.2d at 7. The reason for this is simple: "a codefendant's lesser sentence does not reduce the moral culpability of the killing or make it less deserving of the penalty of death than other first degree murders. The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense." *Id.* (internal quotations omitted).

Meyer now challenges the North Carolina Supreme Court's decision, arguing that the trial court's refusal to admit Thompson's life sentence as mitigating evidence violated his Eighth and Fourteenth Amendment rights.

### B.

We think the North Carolina Supreme Court reasonably rejected Meyer's claim. It is entirely within North Carolina's prerogatives to prohibit the admission of an accomplice's sentence at trial.

Under *Lockett v. Ohio* and its progeny, a capital sentencing jury must have the opportunity to "'consider[ ], as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110

(1982) (quoting *Lockett*, 438 U.S. at 604 (plurality opinion)). Since a co-perpetrator's sentence is neither an aspect of the defendant's character or record nor a circumstance of the offense, however, it is within "the traditional authority of a court to exclude" such evidence as "irrelevant." *Lockett*, 438 U.S. at 604 n.12 (noting that courts may exclude "evidence not bearing on the defendant's character, prior record, or the circumstances of his offense").

Thus, we find no error with the North Carolina Supreme Court's decision to prohibit Meyer from entering Thompson's sentence into evidence. It was entirely within its prerogatives as a sovereign entity to exclude evidence of a co-perpetrator's sentence. There are perfectly plausible reasons to do so: for example, the state may want to encourage an individualized determination of moral culpability, or the state may simply think that such evidence is irrelevant. *See McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (noting that evidence is irrelevant if it does not "tend[ ] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value").

We in no way suggest that courts are prohibited from considering a co-perpetrator's sentence. Not only would such a *per se* judgment prohibit a state from adopting sentencing guidelines that require sentences to be measured comparatively to those received in similar cases, but it would also contravene state courts' ability to structure their own evidentiary rules. Instead, our ruling is much narrower: we hold only that the Constitution does not mandate admission of a co-perpetrator's sentence.[4] Beyond this, the individual determination is in the able hands of each individual state.

---

[4]Meyer argues that, under the Supreme Court's decision in *Parker v. Dugger*, 498 U.S. 308 (1991), evidence of an accomplice's lesser sentence is a mitigating factor that falls under the auspices of *Lockett*. We disagree. The Court in *Parker* stated that the trial court should have considered a codefendant's sentence in mitigation because Florida law deemed such evidence to have mitigating value. *See Parker*, 498 U.S. at 315-16. At no point, however, did the *Parker* Court suggest that the consideration of such evidence is constitutionally mandated.

## VIII.

For the foregoing reasons, the district court's dismissal of Meyer's petition for a writ of habeas corpus is

*AFFIRMED*.