NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 18, 2009
Decided January 5, 2010

**Before**

DIANE P. WOOD, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-2713

| | |
|---|---|
| CHRISTOPHER McDONALD, | Appeal from the United States District |
| *Petitioner-Appellant*, | Court for the Northern District of |
| | Illinois, Eastern Division. |
| *v.* | |
| | No. 05 C 820 |
| MARCUS HARDY, | |
| *Respondent-Appellee*. | James F. Holderman, |
| | *Chief Judge*. |

**O R D E R**

Illinois prisoner Christopher McDonald is serving a fifty-year sentence for first-degree murder and related crimes he insists he committed in self-defense. After exhausting his state remedies, McDonald filed a petition for a writ of habeas corpus in the district court. *See* 28 U.S.C. § 2254. The court denied the petition but granted a certificate of appealability on McDonald's claims that he received ineffective assistance of counsel and was harmed by a series of witness-appearance-bond hearings held by the trial court without his knowledge. We affirm the district court's denial of McDonald's petition.

## I. Background

The facts before us are sparse and originate in the Illinois appellate court's decisions on McDonald's direct appeal and petition for postconviction relief. *See People v. McDonald*, 749 N.E.2d 1066 (Ill. App. Ct. 2001); *People v. McDonald*, No. 3-02-0650 (Ill. App. Ct. Aug. 29, 2003) (unpublished). In February 1999, Derrick Gholston, Lucias Byes, and Courtney Ward rode together in a stolen car with John Gholston at the wheel. As they parked the car, McDonald approached, and an argument ensued. John Gholston got out of the car, and McDonald shot him fatally in the chest and fired at the three men still inside. Ward fled the vehicle unharmed, but the other two passengers were wounded.

After McDonald was indicted, the state petitioned the court for material-witness appearance bonds for Byes and Ward, stating that both men feared for their safety and that Byes planned to leave the area. *See* 725 ILCS 5/109-3(d) (permitting judge to require any material witness in criminal prosecution to agree in writing to appear at trial and provide for bond forfeiture if witness does not appear). The state also sought an appearance bond for a third potential witness whom McDonald allegedly told about the shooting when the men were incarcerated together at the county jail. Each petition reported that Derrick Gholston, the third passenger, had since been shot and killed, and that the homicide was still under investigation. Without notifying McDonald, the judge conducted ex parte hearings on the petitions and granted all three, setting a $100,000 recognizance bond for each witness. When McDonald learned about the hearings, he moved to have the indictment dismissed, but his motion was denied.

At trial McDonald testified that he had acted in self-defense, and the court thus gave McDonald the option to have the jury instructed on the lesser-included offense of second-degree murder. In Illinois a defendant is guilty of second-degree murder when he commits first-degree murder and "[a]t the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing" but "his belief is unreasonable." 720 ILCS 5/9-2(a)(2). McDonald declined to offer the instruction, so the jury was instructed only on first-degree murder, which encompasses both intentional homicide and homicide arising from acts that the defendant knows "create a strong probability of death or great bodily harm" to the victim. 720 ILCS 5/9-1(a). The jury convicted McDonald of the latter, as well as unlawful use of a weapon by a felon, two counts of aggravated battery with a firearm, and aggravated discharge of a firearm. The judge sentenced him to concurrent terms of 30 years for first-degree murder, 10 years for aggravated discharge of a firearm, and 5 years for unlawful use of a weapon by a felon. He was also sentenced to consecutive terms of 10 years for each of his two convictions for aggravated battery with a firearm, producing an aggregate sentence of 50 years' imprisonment.

On direct appeal McDonald argued, among other things, that his rights to due process and a fair trial were violated when the court held ex parte hearings on the material-witness appearance bonds. He asserted that the ex parte hearings allowed the prosecution to present "inflammatory" allegations to the trial court insinuating that McDonald was responsible for Derrick Gholston's death; these allegations so biased the judge against him, he argued, that he effectively was prevented from choosing a bench trial. The Illinois appellate court found that "it was clear error" for the trial court not to have notified McDonald of the hearings but concluded that the error was harmless. The state supreme court denied review.

McDonald then filed a pro se postconviction petition arguing, among other things, that his trial counsel was ineffective because he had failed to inform McDonald that his eligibility for good-time credit would differ depending on whether he was convicted of first- or second-degree murder. In Illinois a defendant convicted of first-degree murder is ineligible for good-time credit, whereas a defendant convicted of second-degree murder receives one day of good-time credit for each day served. 730 ILCS 5/3-6-3(a)(2), (2.1). If he had known this, McDonald asserted, he would have requested a jury instruction on second-degree murder. The trial court dismissed the petition as frivolous, and the state appellate court affirmed, concluding that eligibility for good-time credit was collateral to McDonald's conviction and that his lawyer therefore did not have a duty to explain it to him. The state supreme court denied leave to appeal.

McDonald then petitioned the federal district court for a writ of habeas corpus. *See* 28 U.S.C. § 2254. The district court denied the petition but granted a certificate of appealability on McDonald's claims that (1) his trial counsel rendered ineffective assistance in advising him to decline a jury instruction on second-degree murder without informing him of the potential good-time consequences of his decision and (2) his constitutional rights were violated when the trial court held ex parte hearings on the material-witness appearance bonds.

## II. Analysis

We review de novo the district court's denial of McDonald's petition for a writ of habeas corpus. *See Emerson v. Shaw,* 575 F.3d 680, 685 (7th Cir. 2009). Our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which constrains us from disturbing a state court's decision unless it is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1); *Williams v. Thurmer*, 561 F.3d 740, 742 (7th Cir. 2009).

## A.        Ineffective Assistance of Counsel

McDonald argues that the state court's decision on his ineffective-assistance-of-counsel claim was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that counsel's errors affected the outcome of the proceedings. 466 U.S. at 687-88 (1984); *Gonzales v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009). To establish that the state appellate court unreasonably applied *Strickland*, McDonald must demonstrate that the court's decision was not only wrong but was objectively unreasonable. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Emerson*, 575 F.3d at 685. This burden is high: A state court's decision is objectively unreasonable only when it falls "well outside the boundaries of permissible differences of opinion." *Starkweather v. Smith*, 574 F.3d 399, 402 (7th Cir. 2009) (internal quotation marks and citation omitted). When the constitutional standard in question is flexible, as it is under *Strickland*, we must deny relief if we conclude that the state appellate court "took the constitutional standard seriously and produced an answer within the range of defensible positions." *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000).

McDonald argues that counsel was ineffective for advising him to give the jury only two options—first-degree murder and acquittal—without fully explaining the potential sentencing consequences of this strategy. First-degree murder in Illinois carries a sentence of 20 years to life imprisonment, with no eligibility for good-time credit. *See* 730 ILCS 5/5-4.5-20(a); 730 ILCS 5/3-6-3(a)(2)(i). But second-degree murder can be punished by, at most, 20 years' imprisonment, 730 ILCS 5/5-4.5-30(a), and, because a defendant convicted of second-degree murder presumptively receives day-for-day good-time credit, the maximum amount of time he will serve (if none of his good-time credit is revoked) is 10 years. Although instructing the jury on second-degree murder would have all but eliminated any chance of acquittal, McDonald insists that he would not have chosen the all-or-nothing strategy recommended by his attorney if he had known about the good-time consequences of his decision.

In addressing McDonald's claim that his attorney's performance was deficient, the state appellate court began by identifying the proper two-step inquiry for a claim of ineffective assistance of counsel. The court then analogized a defendant's decision to tender a lesser-included-offense jury instruction to the decision to plead guilty to a reduced charge, *see People v. Brocksmith*, 642 N.E.2d 1230, 1232 (Ill. 1994) (concluding that, like decision to plead guilty to lesser charge, decision to submit jury instruction on lesser charge is for defendant, not counsel, to make), and explained that an attorney is not ineffective for failing to advise his client of the collateral consequences of a guilty plea. And good-time credit, the court reasoned, is a collateral consequence of a plea because "there is no assurance" that the

defendant will receive it. The same conclusion had already been reached at least twice by the state appellate court, *People v. Maury*, 678 N.E.2d 30, 33 (Ill. App. Ct. 1997); *People v. Menke*, 390 N.E.2d 441, 443-44 (Ill. App. Ct. 1979), and has since been affirmed at least twice more, *People v. Stewart*, 887 N.E.2d 461, 465 (Ill. App. Ct. 2008); *People v. Frison*, 851 N.E.2d 890, 893 (Ill. App. Ct. 2006). The court thus concluded that McDonald's counsel was not ineffective for failing to advise him of the potential good-time consequences of foregoing a jury instruction on second-degree murder. The court never addressed the separate question whether McDonald was prejudiced by counsel's alleged shortcoming.

On appeal, McDonald's primary challenge to the state court's adjudication of his ineffective-assistance claim is that the court unreasonably concluded that good-time credit in Illinois is a collateral consequence of a conviction. He contends that good-time credit is a direct consequence—and thus his attorney was obligated to discuss it with him—because state law provides that prisoners convicted of certain offenses, including second-degree murder, "*shall* receive one day of good conduct credit for each day" of imprisonment, 730 ILCS 5/3-6-3(a)(2.1) (emphasis added), which can only be revoked after a formal administrative proceeding, 730 ILCS 5/3-6-3(c). McDonald contrasts this presumptive entitlement to day-for-day credit with the federal good-time scheme, under which a prisoner receives good-time credit only after the Bureau of Prisons concludes that the prisoner complied with institutional disciplinary regulations during the preceding year. *See* 18 U.S.C. § 3624(b)(1). As further evidence that good-time credit is a direct consequence of a conviction in Illinois, McDonald points out that state courts are permitted to consider a defendant's presumptive good-time credit when determining his sentence, *see People v. Reedy*, 708 N.E.2d 1114, 1116-17 (Ill. 1999); *People v. Fetter*, 591 N.E.2d 474, 478 (Ill. App. Ct. 1992), and that judges must announce at sentencing the period of time the defendant will likely spend in prison as a result of good time, 730 ILCS 5/5-4-1(c-2); *Reedy*, 708 N.E.2d at 1117.

The question whether good-time credit in Illinois is a direct or collateral consequence of a conviction is a difficult one. But our task on habeas review is not to evaluate whether the state appellate court's conclusion about good-time credit was incorrect but rather to decide whether its conclusion about counsel's ineffectiveness was objectively unreasonable under federal law. And, given the difficulty of categorizing good-time credit as a direct or collateral consequence even under federal law, we cannot conclude that the state court's decision that counsel was effective was "well outside the boundaries of permissible differences of opinion." *Starkweather*, 574 F.3d at 402.

The Supreme Court has never adopted the dichotomy between direct and collateral consequences that the Illinois appellate court uses to sort out an attorney's duties to his

client under *Strickland*. But decisions from the federal appellate courts, though not controlling for purposes of AEDPA, can help us determine whether a state court's application of Supreme Court precedent was unreasonable. *See Burgess v. Watters*, 467 F.3d 676, 687 (7th Cir. 2006); *Jackson v. Frank*, 348 F.3d 658, 665 (7th Cir. 2003). The federal courts of appeal frequently have concluded that an attorney who fails to inform his client of direct consequences of a conviction is ineffective but that an attorney need not mention collateral consequences.[1] *See, e.g., Santos-Sanchez v. United States*, 548 F.3d 327, 334 (5th Cir. 2008); *Bustos v. White*, 521 F.3d 321, 325 (4th Cir. 2008); *United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003); *McCarthy v. United States*, 320 F.3d 1230, 1234 (11th Cir. 2003); *Santos v. Kolb*, 880 F.2d 941, 944-45 (7th Cir. 1989). And the federal circuit courts agree that direct consequences are those that are "definite," "immediate," and "automatic," *see, e.g., Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005); *Dalton v. Battaglia*, 402 F.3d 729, 733 (7th Cir. 2005); *Steele v. Murphy*, 365 F.3d 14, 17 (1st Cir. 2004), such as the minimum amount of time a defendant must serve and the maximum amount of time he may serve, *Jamison v. Klem*, 544 F.3d 266, 277-78 (3d Cir. 2008); *Dalton*, 402 F.3d at 733. On the other hand, courts have defined collateral consequences as those that, even if they are "automatic," are "beyond the control and responsibility" of the sentencing court, *e.g., Kratt v. Garvey*, 342 F.3d 475, 485 (6th Cir. 2003); *United States v. Amador-Leal*, 276 F.3d 511, 516-17 (9th Cir. 2002), or are "in the hands of" another government agency or the defendant himself, *Torrey v. Estelle*, 842 F.2d 234, 236 (9th Cir. 1988). The possibility of civil commitment, *Steele*, 365 F.3d at 17, the loss of federal benefits, *United States v. Morse*, 36 F.3d 1070, 1072 (11th Cir. 1994), deportation, *Santos*, 880 F.2d at 944-45, and the effect of a guilty plea on future convictions, *King v. Dutton*, 17 F.3d 151, 153-54 (6th Cir. 1994), have all been deemed collateral. Parole eligibility—the consequence most analogous to eligibility for good-time credit—also has been classified as collateral. *See Bustos*, 521 F.3d at 325-26 (collecting cases). *But see Bell v. State*, 576 F.2d 564, 566 (4th Cir. 1978) (concluding, without deciding whether parole is direct or collateral consequence, that defendant must be informed of ineligibility for parole before pleading guilty); *United States v. Smith*, 440 F.2d 521, 523-26 (7th Cir. 1971) (same); *Durant v. United States*, 410 F.2d 689, 692 (1st Cir. 1969) (same).

---

[1]Courts distinguish between failing to inform and actively misinforming a defendant about collateral consequences. *See, e.g., Beavers v. Saffle*, 216 F.3d 918, 925 (10th Cir. 2000); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989); *see also Commonwealth v. Padilla*, 253 S.W.3d 482 (Ky. 2008), *cert granted*, 129 S. Ct. 1317 (2009) (granting certiorari on question whether misadvice about immigration consequences of conviction can amount to ineffective assistance of counsel). McDonald does not argue that his attorney misinformed him about his eligibility for good-time credit.

Thus, in employing the widely used distinction between direct and collateral consequences to determine whether McDonald received constitutionally defective advice from counsel, the state appellate court did not act unreasonably. And the court's ultimate conclusion—that good-time credit is indeed collateral—also was not unreasonable. Although an eligible Illinois prisoner has a presumptive entitlement to good-time credit, the amount of credit he actually receives is controlled by variables—including the defendant's own conduct and, if he misbehaves, the will of the Prisoner Review Board—external to the sentencing court. *See* 730 ILCS 5/3-6-3(c). Whether the defendant must earn the credit (as under the federal good-time scheme) or has a presumptive entitlement to it (as under the Illinois scheme), the effect of good-time on the defendant's sentence is unknowable at the time of sentencing. And, whether right or wrong, it was not objectively unreasonable for the state appellate court to describe this as collateral, and to describe counsel's silence about it as constitutionally permissible. *See Meyer v. Branker*, 506 F.3d 358, 368 (4th Cir. 2007) ("A consequence is 'collateral' when it is uncertain or beyond the direct control of the court."); *Broomes v. Ashcroft*, 358 F.3d 1251, 1256-57 (10th Cir. 2004) ("A consequence is collateral if it 'remains beyond the control and responsibility of the district court in which that conviction was entered.'") (quoting *United States v. Gonzalez*, 202 F.3d 20, 27 (1st Cir. 2000)).

Because the state appellate court did not unreasonably conclude that McDonald's eligibility for good-time credit was a collateral consequence of his decision to forego a jury instruction on second-degree murder—and that his attorney thus was not obligated to discuss it with him—we need not consider the prejudice prong of *Strickland*. *See Harris v. United States*, 366 F.3d 593, 596-97 (7th Cir. 2004).

## B.      Ex Parte Appearance-Bond Hearings

We turn, then, to the second issue certified for appeal—whether McDonald was harmed by his exclusion from the appearance-bond hearings. Although "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure," *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), ex parte communications are subject to harmless-error analysis, *Rushen v. Spain*, 464 U.S. 114, 117-20 (1983). The state appellate court held that it was error for McDonald to be excluded from the appearance-bond hearings but concluded that the error was harmless because no inflammatory communication occurred at the hearing that could have influenced the trial judge and there was nothing that McDonald's presence could have done to affect the proceedings. McDonald argues that this was error, but we disagree.

McDonald identifies three ways in which he allegedly was harmed by the ex parte appearance-bond hearings. First, he asserts that the bonds "inevitably . . . pressured the

witnesses into testifying against" him and that his presence at the hearings would have prevented the trial court from issuing the bonds. But an appearance bond does not "inevitably" pressure the witness to testify in favor of the prosecution. The bond serves as a "forceful reminder" of the witness's obligation to testify, *Pruitt v. McAdory*, 337 F.3d 921, 927 (7th Cir. 2003), but it does not promise leniency or a reward for testifying in a particular manner. While McDonald may have preferred that the witnesses not appear to testify against him at all, his assertion that the bonds had any effect on the content of their testimony is entirely speculative. And in any event, McDonald was aware of the bonds prior to trial and could have used their existence to undermine the veracity of the witnesses' testimony if he wished.

Moreover, there is no evidence that McDonald's presence at the hearings would have had any effect on the issuance of the bonds. Contrary to McDonald's assertion, the trial judge was not required to make a finding about whether the witnesses' "supposed fears were groundless" before issuing the bonds. The judge needed only to determine whether the witnesses were material, whether a risk of nonappearance existed so as to justify the use of a recognizance bond, and how much the bond should be. *McDonald*, 749 N.E.2d at 1070. McDonald has not challenged the witnesses' materiality or suggested that they were not reluctant to testify. Whether he agrees that they had legitimate fears about the repercussions of testifying against him is irrelevant.

Next, McDonald asserts that the "unchallenged allegations" of his "dangerousness" during the hearings so biased the judge against him that he was effectively prevented from opting for a bench trial. Although there is no federal constitutional right to a bench trial, *Singer v. United States*, 380 U.S. 24, 36 (1965); *United States v. Clark*, 943 F.2d 775, 784 (7th Cir. 1991), Illinois recognizes such a right, *People v. Gersch*, 553 N.E.2d 281, 284-85 (Ill. 1990). Nevertheless, McDonald had already been indicted for first-degree murder, and it is frivolous to argue that the information in the bond petitions had any additional impact on the judge's impartiality. In any event, McDonald does not assert that he would have waived his right to trial by jury if not for the alleged damage done at the bond hearings, and, as the state appellate court pointed out, he had the opportunity to request a new judge but did not.

Finally, McDonald asserts that his absence from the hearings harmed him because, as a result of the hearings, the trial judge believed that he was dangerous and consequently ordered him shackled during the trial. This argument is procedurally defaulted. McDonald first raised the general issue of shackling in a second petition for postconviction relief, asserting that his right to due process had been violated because he was forced to appear before the jury in shackles without an individual determination that shackling was warranted. *People v. McDonald*, 846 N.E.2d 960, 963-65 (Ill. App. Ct. 2006). But McDonald in

no way connected the shackling to the ex parte bond hearings and in fact asserted that shackling of felony defendants was standard operating procedure of the sheriff's department at the time of his trial. *See id.* at 963. The state appellate court concluded that McDonald had waived this general attack on shackling by failing to raise it in an earlier proceeding. McDonald's new theory connecting the shackling to the bond hearings is an attempted end run around the procedural default, but he is not permitted to raise new theories that the state courts had no opportunity to address. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001).

### III.  Conclusion

Accordingly, we AFFIRM the judgment of the district court.