COURT OF APPEALS
DECISION
DATED AND FILED

May 31, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP2069-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018CF173

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

DEMETRIUS Q. GORDON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Waukesha County:  RALPH M. RAMIREZ and JENNIFER R. DOROW, Judges. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Demetrius Q. Gordon appeals from a judgment entered after he pled guilty to second-degree intentional homicide, contrary to WIS. STAT. § 940.05(1)(a) (2021-22),[1] for shooting and killing Dontrell M. Burnett.[2] He also appeals from an order denying his postconviction motion, wherein he sought to withdraw his plea. Gordon claims the circuit court erred when it denied his motion without holding an evidentiary hearing. We affirm.[3]

## I. BACKGROUND

¶2 In January 2018, Gordon was driving on the expressway with his two-year-old daughter when he noticed D.J., the mother of his daughter (and his former girlfriend), in Burnett's car. Gordon immediately followed Burnett's car. He pulled up on the passenger's side and then on the driver's side. Gordon wanted Burnett to stop the car because he wanted D.J. to get out. Burnett, a longtime friend of D.J., was driving her to work. Burnett's cousin was in the back seat of Burnett's car. Because of Gordon's dangerous driving, Burnett exited the expressway to get away from Gordon. Gordon, however, followed Burnett off the expressway. When Burnett parked his car, Gordon parked directly behind him. Burnett exited his car and walked toward Gordon's car when Gordon pointed a gun out his driver's side window and began shooting at Burnett. When Burnett saw the gun, he turned and ran into the street, away from the cars and toward the

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] The Record contains two different spellings for the victim's first name. We use the spelling in the Complaint.

[3] The Honorable Ralph M. Ramirez presided over this matter through the judgment of conviction. The Honorable Jennifer R. Dorow entered the amended judgment of conviction and presided over the postconviction proceedings.

median. Gordon shot Burnett multiple times, and Burnett died at the scene. After Gordon shot Burnett, he fled the scene, tossed the gun, and hid his car, which the police located several months later.

¶3 The State charged Gordon with first-degree intentional homicide. Gordon's version of the story was that he feared for his life when Burnett approached his car. He claims Burnett had threatened him in an earlier encounter and that Burnett threw a brick at his car. Gordon also claims he believed Burnett had a gun. The police never found a brick at the scene, and it is undisputed that Burnett did not have a gun. Other witnesses at the scene did not see any objects in Burnett's hands. However, D.J. told police she saw Burnett grab a plastic ashtray that she thought he was going to take with him when he got out of the car, but he did not take it. Witnesses said Burnett made it to the front side of Gordon's car when Gordon stuck his right hand holding a gun out his driver's side window. Burnett turned and ran. Another witness said Gordon tracked Burnett's movements and kept shooting at Burnett as he ran toward the middle of the street. Most witnesses thought Gordon fired five times. Gordon was twenty-four years old at the time of the incident.

¶4 Gordon's trial counsel had thirty-three years of experience. He wrote a letter to the district attorney detailing a self-defense case, which said: "[a]fter a careful review of all available information in this case it is clear that Demetrius Gordon was legitimately acting in the defense of himself and his infant daughter when he shot" Burnett. The letter claimed that Burnett was a gang member who had threatened Gordon in a previous encounter, and Gordon was trying to call and text D.J. when he saw her in Burnett's car on the date of the shooting, which "explains his erratic driving[.]" The letter also blamed Burnett as the aggressor, who was angry and "intending violence towards" Gordon—alleging

3

Burnett "violently ran upon [Gordon] throwing debris at his car" that "bounc[ed] off of the hood[.]" Trial counsel asserted Gordon's response arose out of "self-preservation and the preservation of an infant child who [was] sitting in the path of violence." The letter claimed "Gordon did nothing to provoke" Burnett. The letter asserted that the autopsy report showed Burnett was "intoxicated on THC" and "was not running away" when he was shot. Trial counsel's records showed that the letter was shared with Gordon and Gordon's uncle, but Gordon claimed in his postconviction motion that he never saw or received a copy of the letter. The letter, however, and trial counsel's advocacy about Gordon acting in self-defense led the State to offer a plea bargain.

¶5    The State offered to amend the charge to second-degree intentional homicide based on trial counsel's letter and in an effort to avoid trial. The amended charge provided a significant advantage to Gordon as it reduced his potential prison exposure from life to a maximum sentence of sixty years (forty of initial confinement followed by twenty of extended supervision). Gordon accepted the plea bargain. Gordon completed and signed a plea questionnaire/waiver of rights form, which had attached to it the jury instructions for first-degree intentional homicide, second-degree intentional homicide, and self-defense. The self-defense portion of the instruction provided:

> The Criminal Code of Wisconsin provides that a person is privileged to intentionally use force against another for the purpose of preventing or terminating what (he) (she) reasonably believes to be an unlawful interference with (his) (her) person by the other person. However, (he) (she) may intentionally use only such force as (he) (she) reasonably believes is necessary to prevent or terminate the interference. (He) (She) may not intentionally use force which is intended or likely to cause death unless (he) (she) reasonably believes that such force is necessary to prevent imminent death or great bodily harm to (himself) (herself).

4

As applied to this case, the effect of the law of self-defense is:

• The defendant is not guilty of either first or second degree intentional homicide if the defendant reasonably believed that (he) (she) was preventing or terminating an unlawful interference with (his) (her) person, and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to (himself) (herself).

• The defendant is guilty of second degree intentional homicide if the defendant caused the death of (name of victim) with the intent to kill and actually believed the force used was necessary to prevent imminent death or great bodily harm to (himself) (herself), but the belief or the amount of force used was unreasonable.

• The defendant is guilty of first degree intentional homicide if the defendant caused the death of (name of victim) with the intent to kill and did not actually believe the force used was necessary to prevent imminent death or great bodily harm to (himself) (herself).

¶6 At the November 2018 plea hearing, the circuit court announced it had received the plea questionnaire/waiver of rights form that Gordon and his trial counsel had signed two days earlier. The court brought up that WIS JI—CRIMINAL 1014 was attached to the form, and it "sets out the instruction for first degree intentional homicide, self-defense and second degree intentional homicide[.]" The court discussed the maximum penalty with Gordon and ensured he knew that if he pled guilty, the court could sentence him to "forty years initial confinement, twenty years extended supervision[.]" Then, the court told Gordon it wanted to talk with him "about the plea questionnaire and waiver of rights form and the jury instruction[.]"

¶7 But first, the circuit court asked the State why it amended the original charge. The State explained that it would be able to prove to a jury that Gordon committed first-degree intentional homicide. But, in the interest of

resolving the case, it amended the charge down to second-degree intentional homicide because, based on the jury questions the defense wanted to ask, the defense believed it had "an imperfect self-defense argument." In fact, the court asked Gordon's counsel if he planned to make an imperfect self-defense argument, and counsel confirmed that was true.

¶8 The circuit court confirmed directly with Gordon that he was twenty-four years old and had completed high school. The court then directly asked Gordon if he had the ability "to read and understand all the documents that have been generated as a result of the investigation in this case" and if he had enough time to "read and review everything[.]" Gordon answered, "Yes, sir." When the court asked Gordon if he needed more time to review materials, Gordon answered, "No, sir."

¶9 The circuit court brought up WIS JI—CRIMINAL 1014 a second time, restating that the instruction sets out first-degree intentional homicide, *self-defense*, and second-degree intentional homicide, and then asked Gordon if he reviewed the instruction with his attorney. Gordon responded, "Yes, sir." Gordon confirmed that he understood what the State would have to prove if he took the case to trial. Then, the court observed that the jury instruction was eight pages long and asked Gordon if he was sure he "had enough time to review those with" his counsel. Gordon again responded, "Yes, sir."

¶10 Next, the circuit court confirmed that Gordon understood the elements of the crime that the State would have to prove beyond a reasonable doubt before Gordon could be found guilty. Gordon also confirmed that his constitutional rights were listed in the plea questionnaire/waiver of rights form and that he reviewed those with his attorney, he understood all of them, and he was

"freely and voluntarily" giving up each of those rights. The court then went through each right individually and asked Gordon if he was giving up each right, including his right to remain silent, right to testify, right to present evidence, right to call witnesses, right to a jury trial, right to confront witnesses against him, and right to make the State prove his guilt beyond a reasonable doubt. Gordon confirmed he was giving up each of those rights. Next, the court asked Gordon if he had "[a]ny questions about these rights[,]" and Gordon answered, "No, sir."

¶11 The circuit court then went over the charge and asked Gordon if he committed it, to which Gordon said, "Yes, sir." Then the following exchange occurred:

> THE COURT: … Did you cause the death of Dontrel Burnett?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Did you do so by shooting him with a gun?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: A firearm?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And whose firearm was that?
>
> THE DEFENDANT: That was mine.
>
> THE COURT: All right. And you knew that there were bullets in the gun?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And did you intend to kill him? That is, you pointed the gun at him?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And you pulled the trigger?
>
> THE DEFENDANT: Yes, sir.

7

THE COURT: And you knew that when someone pulls the trigger on a gun, that the firearm can cause the death of another?

THE DEFENDANT: Yes, sir.

THE COURT: So, you intended to kill him and you caused his death by shooting him, and then you did so with purpose, with intent; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: *Now, is it your position that you believe that you needed to do so to protect yourself?*

THE DEFENDANT: *Yes, sir.*

THE COURT: All right. *And that's the dispute here. In this case your position is that it was self-defense and the State's position is that it was not; right*?

THE DEFENDANT: *Yes, sir.*

THE COURT: Nevertheless, you admit you intended to kill him and that you, in fact, did so by shooting him; is that correct?

THE DEFENDANT: Yes, sir.

(Emphasis added.)

¶12   Gordon then confirmed that he read the Complaint and that the facts laid out in the Complaint were "substantially accurate[.]" Gordon's counsel then told the court it could use the Complaint as the factual basis to accept Gordon's plea.

¶13   The circuit court again offered Gordon time to talk to his counsel and review materials. It commented that it had given Gordon and his counsel additional time when they had previously appeared before the court. Gordon said he did not need any more time and that he had talked to his counsel about entering the plea and withdrawing all previously filed motions. The court turned again to the plea questionnaire/waiver of rights form, noting that Gordon signed the form

acknowledging that Gordon had "reviewed and understand[s] this entire document and any attachments. [He] ha[s] reviewed it with [his] attorney. [He] ha[s] answered all questions truthfully and either [he] or [his] attorney ha[s] checked the boxes" and wants the court "to accept [his] plea and find [him] guilty."

¶14 When the circuit court asked Gordon if he wanted the court to find him guilty, Gordon answered, "Yes, sir." The court returned again to the reason for the amended charge, explaining to Gordon that the State believes it could convict him on first-degree intentional homicide but that Gordon's "position is that there was an element of self-defense involved in this case." The court told Gordon again that the jury instruction "deals with all those things[.]" Gordon again acknowledged this was correct. The court again asked if Gordon "had enough time," if he understood the instruction, and if he had any questions for the court. Gordon responded that he did not need more time, he understood the instruction, and he did not have any questions. The court gave Gordon another opportunity to change his mind about entering a plea and asked if he wanted any more time. Gordon expressed that he did not want more time, and he wanted to enter his plea.

¶15 The circuit court then asked Gordon's trial counsel if he had enough time to speak with Gordon about the case, and counsel responded affirmatively. Trial counsel told the court: "I supplied him with a copy of the guilty plea questionnaire and the jury instructions a week ago. I had him look over those and read through them. And then I sat down with him for a couple hours and we went through them together. I believe that he understands everything in there to the best of his ability." Trial counsel told the court he believed Gordon's plea/waiver of rights was entered freely and voluntarily, that he had ample opportunity to

review the materials with him, and that they discussed "any possible defenses or motions that could have been filed[.]"

¶16    The circuit court accepted Gordon's guilty plea and found him guilty.    At the sentencing hearing, the State asked the court to impose the maximum penalty.  It emphasized again that it reduced the charge, not because it believed "there was even an imperfect self-defense here[,]" but because it was willing to reduce the charge so that Gordon could "take responsibility for his actions," and resolution by a guilty plea would "save the [victim's] family [from] testifying at trial, seeing the trial, [and] hearing about their son, their brother's death[.]"  Burnett's father asked the court "to sentence Mr. Gordon to the fullest extent of the law."    Burnett's mother provided a statement asking for the maximum penalty.

¶17    Gordon's trial counsel tried to minimize Gordon's conduct and blamed Burnett in his sentencing argument.  He told the circuit court that Gordon just happened to come across Burnett's car on the expressway, and he tried to get D.J.'s attention by pulling up alongside Burnett's car.  Counsel asserted that Gordon simply panicked when Burnett got out of his car and walked toward Gordon.  He panicked because he alleges Gordon threw a rock at his car, he thought Burnett had a gun, and Burnett had previously threatened Gordon. Defense counsel asked the court to impose a sentence of eight to ten years in prison.

¶18    The circuit court imposed a sentence consisting of twenty years' initial confinement followed by ten years' extended supervision.  The court noted that Gordon put himself in the situation:  "Gordon put himself in that position on that day where he had to make that decision, which was a wrong and life ending

decision. So, that is his fault." "You are the one that created this problem on that day." "You gave chase. You followed the car." "[Y]ou are the one that created this scene and you are the one that brought it to a tragic life ending scenario." "You gave chase on this day and you created this situation where somebody is dead." Judgment was entered.

¶19 In June 2020, Gordon filed a motion for postconviction relief. He sought plea withdrawal based on his claim that his plea was not knowingly, voluntarily, or intelligently entered "because his trial attorney provided ineffective assistance when he failed to advise him about information in the discovery materials that would have been helpful at trial and failed to advise him of trial defenses that would have been available to him." Specifically, Gordon alleged his trial counsel told him he could not present self-defense at trial, he failed to inform him about the castle doctrine or the defense-of-others defense, and he failed to provide him with some discovery materials that would have supported Gordon's version of events. Gordon alleged that:

- "If he had been aware that he could raise self-defense, he would not have entered a plea, but would have insisted on a trial";

- "If he had been aware that [the castle-doctrine] defense[] [was] available to him at trial, he would not have entered a plea, but would have insisted on a trial"; and

- "[I]f he had been aware" that D.J. described Burnett as "angry when he hastily exited his car and that he grabbed a black 'ash tray' before exiting the car" and about "a mark on the hood of [his] car near the windshield" "which corroborated his account of Mr. Burnett throwing an object at his car and causing him to fear for his life, he would not have entered a plea but would have insisted on a trial."

¶20     The circuit court denied Gordon's postconviction motion without holding a ***Machner***[4] hearing.  It held that the Record conclusively showed that Gordon was not entitled to an evidentiary hearing.  The basis for the postconviction court's ruling was that the Record contained information that showed Gordon knew he could have presented a defense based on self-defense. The postconviction court pointed to the plea questionnaire/waiver of rights form, which included the self-defense jury instruction.  The postconviction court also pointed to the plea hearing transcript and the repeated references to self-defense as well as the colloquy between the circuit court and Gordon, where it was clear Gordon knew he was giving up any self-defense claim by entering his guilty plea.

¶21     Specifically, the postconviction court found:  "the records before me conclusively show that the defendant was aware that he could raise self-defense as a defense to first-degree intentional homicide.  He understood what he was giving up by entering his guilty plea to the amended charge of second-degree homicide -- intentional homicide and that he was waiving his right to assert self-defense at a trial."  The court also ruled:  "based upon my review of the preliminary hearing transcript, based upon my review of the plea questionnaire which includes that jury instruction, Mr. Gordon understood the interplay between a claim of self-defense and first-degree intentional homicide, and as the State referenced it, a claim of imperfect self-defense, which could lead a jury to find Mr. Gordon guilty of second-degree intentional homicide."

¶22     Further, the postconviction court concluded that even if it accepts Gordon's claims, "they do not overcome the evidence on the record to show that

---

[4] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Mr. Gordon knew he could raise self-defense and knew he was waiving that by entering his guilty plea to the amended charge." Stating it another way, the postconviction court ruled Gordon: "has not shown by clear and convincing evidence that withdrawal of his plea would result in a manifest injustice, because even if I assume on every point that Mr. Gordon raises that [his trial counsel] failed, was deficient, his deficiency cannot be prejudicial under the facts of this case because, again, Mr. Gordon knew and this record conclusively shows he knew he could raise the issue of self-defense."

¶23 The postconviction court also rejected Gordon's castle-doctrine defense claim because the facts would not have supported that claim. The statute contains strict requirements in order for Gordon to rely on the castle defense. Namely, he would need to show that Burnett "was in the process of unlawfully and forcibly entering the actor's ... motor vehicle ... and the actor knew or reasonably believed that an unlawful and forcible entry was occurring." *See* WIS. STAT. § 939.48(1m)(ar)1. Likewise, the postconviction court rejected Gordon's assertion that his trial counsel was ineffective for not discussing with Gordon or pursuing a defense-of-others defense.

¶24 The postconviction court found that the Record conclusively showed that Gordon failed to establish he received ineffective assistance of counsel. It did not see Gordon's trial counsel's actions as deficient. Rather, it applauded Gordon's trial counsel's representation, explaining that counsel "accomplished something very important for Mr. Gordon." "Mr. Gordon did not enter a plea to first-degree intentional homicide. He entered a plea to second-degree intentional homicide, thereby reducing his exposure from life to 60 years.… [T]hat is evidence of the exceptional work that [trial counsel] did in this case." But, even if the court had concluded trial counsel acted deficiently, there can be no prejudice

because the Record shows Gordon "was aware of his rights to claim self-defense; he was aware of the mitigating factors[.]" The court concluded that Gordon's failure to establish ineffective assistance based on the contents of the Record means he has failed to demonstrate by clear and convincing evidence that a manifest injustice exists; no manifest injustice means no plea withdrawal.

## II. DISCUSSION

¶25 "When a defendant seeks to withdraw a guilty plea after sentencing, he must prove, by clear and convincing evidence, that a refusal to allow withdrawal of the plea would result in 'manifest injustice.'" *State v. Brown*, 2006 WI 100, ¶18, 293 Wis. 2d 594, 716 N.W.2d 906 (citation omitted). "One way to demonstrate manifest injustice is to establish that the defendant received ineffective assistance of counsel." *State v. Dillard*, 2014 WI 123, ¶84, 358 Wis. 2d 543, 859 N.W.2d 44.

¶26 To establish ineffective assistance, a defendant must show: (1) deficient performance and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must point to specific acts or omissions by the lawyer that are "outside the wide range of professionally competent assistance." *Id.* at 690. To prove prejudice in the context of a plea withdrawal, a defendant must demonstrate "'that there is a reasonable probability that, but for the counsel's [alleged] errors, he would not have pled[] guilty and would have insisted on going to trial.'" *State v. Bentley*, 201 Wis. 2d 303, 312, 548 N.W.2d 50 (1996) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). A court need not address both prongs of the *Strickland* test if the defendant does not make a sufficient showing on one. *See Strickland*, 466 U.S. at 697.

¶27    When a defendant claims a plea was improperly entered because he did not receive effective assistance, we apply the standards set forth in ***Nelson v. State***, 54 Wis. 2d 489, 195 N.W.2d 629 (1972) and ***Bentley***.   To entitle a defendant to an evidentiary hearing under ***Nelson/Bentley***, "a defendant first must allege sufficient, nonconclusory facts in his motion that, if true, would entitle him to relief."  ***State v. Howell***, 2007 WI 75, ¶76, 301 Wis. 2d 350, 734 N.W.2d 48. "A defendant must do more than merely allege that he would have pled differently; such an allegation must be supported by objective factual assertions." ***Bentley***, 201 Wis. 2d at 313.  "This is an objective inquiry and dependent on the likely outcome of a trial had the defendant not pleaded guilty."  ***Meyer v. Branker***, 506 F.3d 358, 369 (4th Cir. 2007) (citation omitted).  "If the defendant meets the pleading requirements, the circuit court then must look to the record."  ***Howell***, 301 Wis. 2d 350, ¶76.  "If the record conclusively demonstrates that the defendant is not entitled to relief, then the circuit court in its discretion may grant or deny an evidentiary hearing."  ***Id.***, ¶77.

¶28    Here, the postconviction court properly exercised its discretion to deny Gordon an evidentiary hearing because it "examined the relevant facts, applied the proper legal standards, and engaged in a rational decision-making process." *See* ***Bentley***, 201 Wis. 2d at 318.  The court, relying on the correct legal standards, applied the pertinent facts and reached a rational decision when it found the Record conclusively refuted Gordon's claims that his trial counsel was ineffective.  The Record conclusively shows there is no *reasonable* probability that, but for his counsel's alleged errors, Gordon would have turned down the plea bargain and insisted on going to trial.

¶29    Gordon's motion alleges three things with respect to the ***Strickland*** prejudice prong.   First, he says if he had been aware that he could raise

15

self-defense at trial, he would have gone to trial. Second, he says if he had been aware of the castle doctrine, he would have gone to trial. Third, he says if he had been aware of some statements that supported his version of what happened, he would have gone to trial. None of these are sufficient to obtain an evidentiary hearing.

¶30    With respect to his first allegation, the Record conclusively shows Gordon was aware he could claim self-defense. The plea questionnaire/waiver of rights form, together with Gordon's own statements at the plea hearing, conclusively shows that Gordon was well aware that the defense strategy for trial was self-defense. The plea questionnaire form contained the jury instruction for self-defense. Notably, Gordon admitted that he reviewed all eight pages of the instruction with his trial counsel over several hours, he understood all of it, and he was willingly waiving his right to assert self-defense. Gordon repeatedly affirmed this when asked by the circuit court. Thus, Gordon cannot establish prejudice because the Record definitively refutes his conclusory allegations that his counsel failed to discuss self-defense with him. *See State v. Sulla*, 2016 WI 46, ¶¶42–48, 369 Wis. 2d 225, 880 N.W.2d 659.[5]

---

[5] Gordon's postconviction motion and brief-in-chief referred only to "self-defense" and did not distinguish between imperfect or perfect self-defense. Perfect self-defense may only be raised when the actor's beliefs are objectively reasonable. WIS. STAT. § 939.48(1) ("A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself."). Under no objectively reasonable view of the evidence could Gordon claim that he acted in perfect self-defense. Therefore, any failure of trial counsel to discuss perfect self-defense cannot be ineffective assistance. *State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16 (explaining that counsel is not deficient for failing to raise a nonmeritorious argument).

¶31     Moreover, the only reason Gordon was offered the reduction in charge was due to his trial counsel's efforts to convince the State that imperfect self-defense was a possibility at trial.  Doing so resulted in a substantial benefit to Gordon.  It reduced his prison exposure from life in prison to forty years in prison.  Under the facts of this case, no reasonable person would have rejected a plea with that reduction in exposure.  And, because of the plea and trial counsel's efforts, Gordon did not even receive forty years in prison for killing an unarmed man who witnesses said was running away from him.  He was sentenced to only twenty years in prison.

¶32     Gordon's second claim—that had counsel discussed the castle doctrine with him, he would have insisted on going to trial—was also insufficient to warrant an evidentiary hearing.  The castle doctrine only applies in particular circumstances.  It requires both that "[t]he person against whom the force was used was in the process of unlawfully and forcibly entering the actor's … motor vehicle … and the actor knew or reasonably believed that an unlawful and forcible entry was occurring."  WIS. STAT. § 939.48(1m)(ar)1.  There are no objective factual assertions that would support application of the castle doctrine as a defense.  Gordon's self-serving conclusory statement that he believed Burnett was "in the process of gaining entry to the car" is simply not enough.  Gordon would need to allege that Burnett grabbed the door handle or opened the door—that Burnett was actually entering Gordon's car.  By all other accounts, Burnett did not make it past the front of Gordon's car before Gordon started shooting at him.  Accordingly, even if we accept Gordon's claim that his counsel failed to discuss the castle doctrine specifically, he was not prejudiced because it did not apply in this factual scenario.

17

¶33    With respect to his similar claim about his counsel's failure to discuss defense of others as a part of self-defense, Gordon did not make any objective factual assertions to demonstrate that his counsel's failure to specifically discuss defense of others prejudiced him.  Gordon knew the defense trial plan rested on a claim of self-defense—that was clear from the plea questionnaire/waiver form and the plea hearing.  The claim of self-defense both of Gordon himself and of his daughter was asserted to obtain the reduction in the charge, which reduced Gordon's exposure from life in prison to forty years in prison.  There is no reasonable probability that Gordon would have rejected this beneficial plea and risked going to trial, where he could have been convicted on the original charge.  Regardless of whether his counsel talked to him about self-defense in general or defense of others specifically, Gordon knew his case involved self-defense, and there would have been no substantial difference in assessing whether to accept the favorable plea bargain.  Defense of others did not provide any broader privilege than self-defense.

¶34    Gordon's third prejudice allegation is that if trial counsel had told him about certain facts in the police reports and discovery materials that corroborated Gordon's version of events, he would have gone to trial.  Specifically, these favorable facts were:  (1) D.J.'s statement that Burnett was angry and grabbed an ashtray before getting out of the car; (2) an officer's statement about a scratch on the hood of Gordon's car; and (3) the autopsy report that showed the bullets struck Burnett laterally instead of from the back, which supported Gordon's claim of self-defense.  These facts are insufficient to warrant an evidentiary hearing because none of the facts would have resulted in Gordon obtaining a better result than what he got with the plea bargain.  The evidence was overwhelmingly against Gordon:  for example, the number of shots he fired,

witnesses' statements that he continued to shoot at Burnett as Burnett ran away, that Gordon "tracked" Burnett with the gun as Burnett ran away, and that Gordon fled the scene, tossed his gun, and hid his car. The small number of facts that may have supported Gordon's version would not have resulted in rejecting the favorable plea deal trial counsel was able to secure for Gordon. There is no *reasonable* probability that Gordon would have rejected this plea bargain even if he knew about the additional facts he claims he was never told.

¶35 With respect to the autopsy report, it is not as favorable to Gordon as he makes it seem. The bullet that killed Burnett entered the left side of his chest and exited the right side. Although this was not a shot in the victim's back, it is also not a shot in his front. The autopsy report was consistent with the witnesses' accounts that when Burnett saw the gun, he turned and ran across the street. Further, the autopsy report does not change the fact that all the witnesses said Gordon continued to shoot at Burnett as he ran away.

¶36 Moreover, had Gordon gone to trial, he may not have even been able to argue self-defense because Gordon's actions provoked Burnett to walk toward him. *See* WIS. STAT. § 939.48(2)(a) (stating that the self-defense privilege is not available when a person provokes an attack unless a defendant's beliefs of "imminent danger of death or great bodily harm" are reasonable and only after a defendant "reasonably believes he or she has exhausted every other reasonable means to escape"). There was substantial evidence that Gordon provoked the attack because he chased Burnett on the expressway and followed him when he exited. There is no evidence that Gordon made any attempt to "escape" the situation he created. Gordon could have continued to drive on the expressway instead of exiting. Gordon could have driven away as soon as he saw Burnett get

out of his car. Gordon could have even stopped shooting at Burnett as soon as Burnett began to run away.

¶37 Gordon's motion failed to make objective factual allegations on prejudice to warrant an evidentiary hearing. Even if all of his allegations against trial counsel were true, it is unreasonable to conclude he would have rejected the favorable plea bargain his trial counsel obtained.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.